1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ÖSSUR HOLDINGS, INC. and
GENERATION II, USA, INC.,

               Plaintiffs,

    v.

BELLACURE, INC., et al.,

               Defendants.

CASE NO. C05-1552JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion for a preliminary injunction (Dkt. # 38).  Plaintiffs seek to enjoin the Defendants from selling their knee brace product, soliciting distributors for the device, and posting information about the product on a website and in marketing materials.  Plaintiffs also seek a court order directing Defendants to erase any electronic documents originating from Plaintiffs. Having read the papers filed in connection with this motion, and having heard oral argument, the court DENIES Plaintiffs' motion.

## II.  FINDINGS OF FACT

1.      Plaintiff Össur Holdings, Inc. is a Delaware corporation owned by Össur hf, an
          Icelandic publicly traded corporation.

ORDER – 1

2.      Plaintiff Generation II, USA, Inc. is a Washington corporation, which became a wholly owned subsidiary of Össur Holdings, Inc. in September 2003.

3.      Össur Holdings, Inc. and Generation II, USA, Inc. currently do business in the United States under the name of Össur Gen II.

4.      Össur Gen II[1] designs and manufactures prosthetic and orthotic devices, including devices for the treatment of osteoarthritic knee pain.

5.      Defendants Shane Sterling and Maurice Cannon left Össur Gen II and are presently engaged in designing and selling a rival knee brace product for Defendant Bellacure, Inc.

6.      Mr. Sterling worked for Össur Gen II from April 2000 to April 2004 as a product development engineer, a managing engineer, and ultimately as the director of research and development.  Prior to working at Össur Gen II, Mr. Sterling gained expertise in the field of biomechanical engineering, including design and development of a knee brace prototype for Seattle Orthopedic Group, Inc.

7.      Mr. Cannon began working for Össur Gen II on November 16, 1999 as a sales associate and later, as the director for national sales.  Mr. Cannon left Össur Gen II in September 2004 after the company demoted him to the position of area manager.  Mr. Cannon came to Össur Gen II with approximately five years prior experience as a salesperson in the ligament and osteoarthritis brace industry. Andrus Decl., Exh. F. at 8.

8.      As a condition of their employment with Össur Gen II, both Mr. Sterling and Mr. Cannon signed a Business Protection Agreement ("BPA").

---

[1] For ease of reference, the court refers to Össur Gen II throughout this order, although the court recognizes that some of the events cited herein predate the formation of the Össur Gen II subsidiary.

ORDER – 2

9.    Mr. Sterling's BPA contains a non-competition provision preventing him from engaging in a competing enterprise for twelve months after the end of his employment.  Andrus Decl., Exh. 43 ¶ 9.

10.   Mr. Cannon's BPA contains a confidentiality provision which provides that Mr. Cannon must protect against any disclosure of "confidential information" during and after his employment with Össur Gen II.  Andrus Decl., Exh. 206. ¶ 2. Confidential information "does not include information that is generally known to the public or is disclosed to Employee by Company without restriction." Id.  Mr. Cannon's BPA also contains a non-solicitation provision which provides, in relevant part, that the employee:

> shall not . . . at any time after his or her employment is terminated . . . :
>      (b)  Solicit Company's employees or contractors to work with other companies; or accept or solicit any work . . . or other business from any Company Business Contact if doing so could reasonably be expected to negatively impact Company's business relationship with the Business Contact; . . . .

Id.

11.   While employed at Össur Gen II, Mr. Sterling supervised an effort to design an updated knee brace, generally referred to as the "Aponos Project."  As part of the Aponos Project, Mr. Sterling and his team worked with One and Co., an industrial design firm, to develop a "new look" for the knee brace.

12.   In February 2003, One and Co. provided Össur Gen II with a report entitled "Design Language Guidelines" for the Aponos Project (the "Guidelines").  The Guidelines summarized the following "functional elements" as characteristics of the new knee brace: an internal "spider strap," a cable dial system (for high end models only), a quick release system, and an inverted hinge mechanism.  Andrus Decl., Exh. 22.  The Guidelines also introduced concepts related to "form," which included: surface simplicity, biomorphic gesture, symmetrical geometry, reduced

ORDER – 3

perceived volume, concealed functionality, vertical line emphasis, clean edge finishing, and a flush surface look.  Id.

13. Össur Gen II did not retain One and Co. to fabricate a prototype based on the concepts and designs contained in the Guidelines.

14. The parties dispute when Mr. Sterling ceased working on the Aponos Project. Plaintiffs provide evidence that Mr. Sterling and his team continued to sketch drawings of individual brace pieces and that Mr. Sterling made at least one presentation about the Aponos Project over the course of the summer and fall of 2003.

15. Regardless of when (or if) Össur Gen II shelved the Aponos Project during Mr. Sterling's tenure, the court finds that the Guidelines released in February 2003 constitute the primary deliverable associated with the Aponos undertaking. Indeed, it is the combination of features depicted in the Guidelines over which Plaintiffs assert trade secret status.  In reference to the Guidelines, Plaintiffs' counsel stated at oral argument that although the Aponos Project was "still in the development stage . . . the ideas are all there."

16. Roughly one month after leaving Össur Gen II in April 2004, Mr. Sterling purchased software, tools and equipment to begin work on his own knee brace design.  During this time, Mr. Sterling met with a business and finance consultant.

17. In September 2004, Mr. Sterling met with One and Co. to discuss development of a tangible prototype.  Mr. Sterling states that he specifically instructed One and Co. to prepare designs for his product independent of anything they had worked on in the past – whether for Össur Gen II or any other company.  Sterling Decl. ¶ 25.

18. In January 2005, Mr. Sterling incorporated Bellacure, Inc.  At that time, Mr. Sterling hired Mr. Cannon as Vice President of Sales and Marketing.

ORDER – 4

19.   Over the next several months, Mr. Sterling engaged various vendors to produce the garment and circuit boards for the product.

20.   In August 2005, Bellacure launched its website, complete with a description of its new knee brace product.  As of October 31, 2005, Bellacure had sold 132 knee braces in the retail market.

21.   Mr. Sterling spent approximately 18 months developing the Bellacure knee brace.  As indicated by Össur Gen II's own industrial engineer, Palmi Einarsson, the typical time frame for development of a prosthetic product – from scratch to market – ranges from 8 to 14 months.  Andrus Decl., Exh. G at 18.

22.   After Sterling's departure, Össur Gen II designers continued to work on an updated knee brace.  The company intends to launch its "Generation III" knee brace in mid-2006.

## III.  CONCLUSIONS OF LAW

1.   The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

2.   Plaintiffs seek an injunction based on their state law causes of action for misappropriation of trade secrets and various breach of contract claims.

3.   The function of a preliminary injunction is to preserve the status quo and to prevent irreparable loss of rights prior to judgment.  <u>Sierra On-Line, Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1422 (9th Cir. 1984).

4.   In order to obtain a preliminary injunction, Plaintiffs must meet either the Ninth Circuit's "traditional" or "alternative" test.  The traditional test requires the court to find that:

> (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits;

ORDER – 5

(3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief.

Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987).

5.    The alternative test requires the court to find that: "(1) a combination of probable success and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Id. (internal citations omitted).

6.    The two prongs of the alternative test are not separate inquiries, but rather "extremes of a single continuum."  Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).

7.    The court's ultimate decision on a motion for a preliminary injunction is within its discretion.  Cassim, 824 F.2d at 796.

8.    In their response, Defendants move to strike exhibits submitted by Össur Gen II on the basis that Plaintiffs have failed to sufficiently authenticate their submissions. The court denies Defendants' request as the court has discretion to consider even inadmissible evidence for purposes of a preliminary injunction motion.  Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984).

9.    Defendants also request an evidentiary hearing, which the court denies.  Stanley v. University of So. California, 13 F.3d 1313, 1326 (9th Cir. 1994) (court may refuse oral testimony where parties given full opportunity to submit written testimony and to argue the matter).  Given the discovery conducted by the parties and the extensive submissions made to the court, the court finds that the parties have had a sufficient opportunity to argue the matter.

ORDER – 6

**Conclusions Regarding Plaintiffs' Likely Success on Their Trade Secrets Claim**

10. Washington's version of the Uniform Trade Secrets Act ("UTSA") authorizes injunctions for "[a]ctual or threatened misappropriation" of trade secrets.  RCW § 19.108.020.

11. Under the UTSA, a trade secret is information, including a formula, pattern, compilation, program, device, method, technique, or process that:

> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW § 19.108.010(4).

12. A new combination of features, even if it includes elements already in the public domain, may constitute a protectable trade secret.  The Boeing Company v. Sierracin Corp., 738 P.2d 665, 675 (Wash. 1987).  Such a combination, for example, may be embodied in plans or drawings.  Id. (reasoning that although cockpit windows were already on the market, the plans and drawings developed by plaintiff to meet FAA requirements were protected trade secrets).  Elevation to trade secret status also requires novelty.  Buffets, Inc. v. Klinke, 73 F.3d 965, 967-68 (9th Cir. 1996) (applying the Washington UTSA).

13. Here, the court concludes that the "combination of features and functionality" as incorporated into the Aponos designs and concepts do not likely constitute trade secrets.

14. Plaintiffs fail to demonstrate how or which "features" and "functionality" combine to form a novel product.  Tellingly, in their last submission to the court, Plaintiffs reiterate that "Defendants have not provided the Court with any evidence to establish that the combination of features incorporated into the Aponos design is

ORDER – 7

found in any other publicly available product."  Pls.' Prop. FF/CL at 25; see also Pls.' Reply at 6 ("defendants have not pointed to any product on the market that comprises these elements in combination.")  Plaintiffs, not Defendants, bear the burden of demonstrating the novelty of the Aponos combination of features. Boeing, 738 P.2d at 674.

15.   Plaintiffs rely heavily on what is provided by Mr. Einarsson, whose testimony is largely focused on a comparison between the Bellacure product and the sketches developed over the course of the Aponos Project.  Mr. Einarsson's comparison between the Aponos concepts and the Bellacure brace, however, does not demonstrate to the court how the former is entitled to trade secret protection in the first place.

16.   Beyond comparisons to the Bellacure product made by Mr. Einarsson and other Össur Gen II employees, the only evidence that bears on whether the Aponos Project embodies a novel combination of features comes from the testimony of One and Co. designer, Claude Zellweger.  Mr. Zellweger states that, at the time he worked on the Aponos designs, he believed that Össur Gen II was making a departure from the "robot" look of other braces on the market.  Andrus Decl., Exh. D at 127-28.  Importantly, he goes on to state that "[e]veryone's trying to get lighter" and that "everyone has adjustable systems," and that the Aponos Project was "never taken to the stage where you could have . . . said that it really does [adjustment] successfully."  Andrus Decl., Exh. D at 127-28.  Even if the court assumes that Mr. Zellweger has a sufficient basis from which to comment on industry-wide features and trends, his testimony does not persuade the court that the Aponos designs and concepts presented a novel combination of features or functionality.

ORDER – 8

17. In the absence of evidence to the contrary, the court is persuaded by Defendants' argument that vague Aponos concepts such as having a "sleek look" and making the product "easy to don" and "comfortable" would be the aspiration of any conscientious industrial engineer. That Mr. Sterling also had such goals for the Bellacure brace does not transform the Aponos designs and concepts into trade secrets.

18. The court concludes that Plaintiffs fail to demonstrate that their designs and concepts likely constitute legally protectable trade secrets. Thus, the court need not reach the issue of misappropriation. Boeing, 738 P.2d at 674 (plaintiff must first establish a legally protectable interest).

**Conclusions Regarding Plaintiffs' Likely Success on the Merits of Their Breach of Contract Claim Against Mr. Sterling**

19. The non-competition provision of Mr. Sterling's BPA expired no later than April 16, 2004.[2]

20. The court concludes that the expired non-competition provision of the Sterling BPA cannot provide a basis for injunctive relief.[3] Alexander & Alexander, Inc. v. Wohlman, 578 P.2d 530, 540 (Wash. Ct. App. 1978) (holding that injunctive relief after non-competition covenants had expired would be "inappropriate and manifestly unfair" to former employees). The court declines to enjoin a breach of

---

[2] The parties alternate between citing April 15th and April 16th as Mr. Sterling's last day of employment with Össur Gen II.

[3] For the first time, Plaintiffs argue in their proposed findings of fact/conclusions of law (Dkt. # 79) that Mr. Sterling is in violation of the confidentiality and non-solicitation provisions of his BPA. The court does not consider either argument as a basis for injunctive relief as Plaintiffs did not directly argue either grounds in their preliminary injunction motion. In any case, the court's conclusion that Plaintiffs have not demonstrated a likely success on their trade secrets claim is dispositive of Plaintiffs' claim that the alleged misappropriation also violated the confidentiality provision of Mr. Sterling's BPA.

ORDER – 9

a contract provision that is no longer in force.  The court, therefore, does not reach the merits of Plaintiffs' claim that from April 2004 to April 2005, Mr. Sterling was in violation of the non-competition clause of his BPA.  Such an inquiry is appropriate only as it relates to a claim for damages.  Id.

21.  The court further concludes that, in this instance, a unilateral modification to the Sterling BPA in order to extend the duration of the non-competition provision for an additional 12 months is contrary to Washington law.  See, e.g., Labriola v. Pollard Group, Inc., 100 P.3d 791, 793-96 (Wash. 2004) (courts enforce non-compete provisions that are reasonable and supported by the parties' consideration).

**Conclusions Regarding Plaintiffs' Likely Success on the Merits of Their Breach of Contract Claim Against Mr. Cannon**

22.  The non-solicitation and confidentiality provisions of Mr. Cannon's BPA contain no expiration date and thus, remain enforceable.

23.  Plaintiffs assert that Mr. Connell is in breach of the non-solicitation and confidentiality provisions of his BPA because he: (a) assisted Mr. Sterling in marketing and promoting the Bellacure brace (which allegedly incorporates Össur Gen II trade secrets); (b) provided Mr. Sterling and Bellacure with the email addresses of distributors used by Össur Gen II; and (c) solicited a distributor used by Össur Gen II to sell the Bellacure brace.  Pls.' Mot. at 33.

24.  The court's conclusion that Plaintiffs have not demonstrated a likely success on their trade secrets claim is dispositive of Plaintiffs' claim that the alleged misappropriation (via marketing and promotion of the Bellacure brace) violated the confidentiality provision of Mr. Cannon's BPA.

25.  As to Mr. Cannon's provision of distributor names and emails to Bellacure and Mr. Sterling, the court concludes that Plaintiffs have not demonstrated a likely

ORDER – 10

success on the merits of their claim that Mr. Cannon is in breach of the confidentiality provision of his BPA. Plaintiffs fail to provide evidence that the names and emails of distributors are not generally known to the public. Indeed, Össur, Inc.'s General Manager, Huld Magnusdottir, notes that customers may (and often do) call the company to ask for distributors in their local area and that such information is readily provided. Andrus Decl., Exh. E. at 68-69. Attendance at a trade show would likewise provide access to such information.

26. The definition of confidential information in Mr. Cannon's BPA expressly excludes that which is disclosed to the employee by Össur Gen II "without restriction." Össur Gen II appears to have released the names and emails to Mr. Cannon "without restriction" when they allowed him to keep the company laptop after his departure without any effort to clean the hard drive or otherwise protect what they now claim is confidential.

27. Plaintiffs argue that Mr. Cannon had other valuable information "in his head" including general knowledge of distributors' sales revenue numbers, which Mr. Cannon does not dispute. Defendants indicate that Mr. Cannon has prior experience in the industry from which he developed personal relationships with various distributors. Further, Mr. Cannon testifies that the relative size and success of distributors is well-known in the industry. Plaintiffs cite the testimony of Mr. Sterling who states that he would not want Össur Gen II to gain access to Bellacure's distributor list because it would not be "good business strategy." Andrus Decl., Exh. A at 28. Mr. Sterling's statement and similar statements made by Mr. Cannon do not render the particular names and email addresses confidential. Without more, the court cannot conclude that Plaintiffs would likely succeed on their claim that Mr. Cannon breached the confidentiality provision of his BPA.

ORDER – 11

28.     As to the non-solicitation provision of Mr. Cannon's BPA, the court concludes that Plaintiffs have not shown a likely success on the merits of their claim that Mr. Cannon is in breach.  Shortly after leaving Össur Gen II, Mr. Cannon emailed Mr. Sterling with an attack plan of "recruiting and signing Össur distributors." Andrus Decl., Exh. 191.  Still, the only evidence bearing on whether Mr. Cannon is soliciting a *current*[4] Össur Gen II distributor comes from his testimony in which he refers to a verbal agreement with distributor Pro Motion Medical Tech, Inc. ("Pro Motion").  Andrus Decl., Exh. F. at 178-79.  Plaintiffs contend that Pro Motion is a current distributor for Össur Gen II.  When asked who initiated the contact, Mr. Cannon could not recall whether Pro Motion contacted Bellacure, or vice versa.

29.     Based on Mr. Cannon's testimony alone, Plaintiffs argue that he is "encouraging [Pro Motion] to terminate its relationship" with Össur Gen II.  Mr. Cannon's testimony does not support this argument.  In fact, Mr. Cannon states that if Pro Motion was a current Össur Gen II distributor, then he would not sign a distribution agreement with them.  Moreover, Ms. Magnusdottir indicates that Össur Gen II's distributors all sign non-compete agreements which would bar them from simultaneously representing Bellacure.  Andrus Decl., Exh. E. at 113. Based on the evidence before it, the court is not persuaded that Plaintiffs have demonstrated a likely success on the merits of their claim that Mr. Cannon has breached his BPA by soliciting current Össur Gen II distributors.

---

[4] Mr. Cannon testifies that several *former* distributors, unhappy with Össur Gen II, have contacted Bellacure for business.  Indeed, roughly six or seven of Bellacure's list of ten potential and actual distributors had contracts with Össur Gen II at one time.  Andrus Decl., Exh. F. at 177 (citing Exh. 238).  Plaintiffs concede, however, that if a distributor had terminated its agreement with Össur Gen II before contacting Mr. Cannon, then under his BPA, Mr. Cannon could lawfully solicit their business.  Pfs.' Reply at 10.

ORDER – 12

30.   Where a plaintiff fails to make a strong showing on the merits, the degree of irreparable harm that it must show is increased. Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985).  Against this backdrop, the court now turns to the issue of irreparable harm.

**Conclusions Regarding Irreparable Harm**

31.   Washington's Uniform Trade Secrets Act ("UTSA") does not articulate the standard by which a court grants injunctive relief.  RCW § 19.108.020.  The Washington statute on injunctions, however, dictates that Washington courts have discretion to grant injunctive relief under the same general principles of equity provided at common law; namely, where one's act causes "great injury" to another prior to an adjudication on the merits.  RCW § 7.40.020.

32.   Irreparable harm exists where monetary damages provide inadequate relief, such as cases involving environmental damage or human suffering.  See, e.g., Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120, 1124 (9th Cir. 2005) (alleged damage to the Sonoran desert); Rodde v. Bonta, 357 F.3d 988, 999 (9th Cir. 2004) (alleged delay or lack of necessary medical treatment, increased pain, and medical complications).

33.   Conversely, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974); Arcamuzi v. Cont'l Air Lines, Inc., 819 F.2d 935, 938 (9th Cir. 1987) ("temporary economic loss alone generally is not a basis for injunctive relief").  Thus, a district court abuses its discretion when it issues a preliminary injunction based on a generalized threat of lost revenue, market value, and goodwill.  Los Angeles Memorial Coliseum Com'n v. Nat'l Football League, 634 F.2d 1197, 1202-03 (9th Cir. 1980).

ORDER – 13

34.   Losses that are merely speculative are insufficient to support a finding of irreparable harm; the injury, rather, must be actual or imminent.  Goldie's Bookstore v. Sup Ct., 739 F.2d 466, 472 (9th Cir. 1984) (trial court's findings that plaintiff would lose goodwill and "untold" customers held speculative on appeal).

35.   Courts in the Ninth Circuit erect a presumption of irreparable harm where a plaintiff proves likely success on the merits of a copyright or trademark infringement claim; however, the court is aware of no binding authority that applies such a presumption in the context of a trade secrets claim.  Compare TeleTech Customer Care Mgmt., Inc. v. Tele Tech Co., 977 F. Supp. 1407, 1412 (C.D. Cal. 1997) (presumption applied in trademark infringement claim) and Pacific Aerospace & Electronics, Inc. v. Taylor, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (presumption not applicable in trade secrets claim).

36.   Although the Washington Supreme Court has upheld an injunction in a trade secrets case where the trial court failed to expressly cite findings related to irreparable harm, the court went on to discuss the existence of such harm – seeming to indicate that the degree of harm retains a role in the analysis.  Boeing Co. v. Sierracin Corp, 738 P.2d 665, 681 (Wash. 1987) ("The potential harm to Boeing as trade secrets holder extends beyond a mere calculation of monetary damages.").

37.   Here, beyond arguing for a blanket presumption in the context of a trade secrets claim, Plaintiffs provide little evidence in the way of demonstrating irreparable harm.  Plaintiffs claim that they will suffer a market disadvantage based on Bellacure's "jump start" in releasing a rival product.  The court concludes that such injury is merely a generalized threat of lost revenue, which can be adequately redressed by monetary relief.  Nat'l Football League, 634 F.2d at 1202-03.  Harm associated with another's profiteering may be remedied, for example, by

ORDER – 14

disgorgement of profits.  <u>See</u> Andurs Decl., Exh. G at 145, Exh. E at 122 (depositions of Mr. Einarsson and Ms. Magnusdottir, respectively, in which both indicate that a licensing fee would be an appropriate way to quantify the damage associated with Defendants' launch of the Bellacure brace).

38.   Plaintiffs contend that their harm extends beyond Bellacure's position as a market participant and that they suffer irreparable injury because other, more established competitors now have access to their trade secrets via the Bellacure website. Plaintiffs assert that the "bell has been rung" and that there is no way to recapture their secret information.  Plaintiffs argue that manufacturers can go to the website and "copy what they see" without Össur Gen II's permission.  Plaintiffs provide no evidence to this end, nor do they provide the court with the particular website content at issue.  Still, the court is mindful that harm associated with a competitor's access to trade secrets may be difficult to quantify and thus, a basis for finding irreparable injury.  <u>Pacific Aerospace</u>, 295 F. Supp. 2d at 1198 (<u>citing Campbell Soup Co. v. ConAgra, Inc.</u>, 977 F.2d 86, 92-93 (3rd Cir. 1992) ("[A]n intention to make imminent or continued use of a trade secret or disclose it to a competitor will almost always certainly show irreparable harm.")).  Even if the court were to presume irreparable harm, however, Plaintiffs would have had to show a likelihood of success on the merits of their trade secrets claim in order to "shut down" Defendants' website.

39.   Plaintiffs further contend that they face irreparable harm because Mr. Cannon has already recruited at least six current or former Össur Gen II distributors.  As discussed previously, Plaintiffs have not demonstrated that Mr. Cannon is soliciting current distributors and furthermore, such distributors would be prohibited by contract with Össur Gen II from signing with Bellacure.

ORDER – 15

1    Accordingly, the court concludes that Plaintiffs do not face imminent, irreparable

2    injury as a result of Mr. Cannon's contact with industry distributors.

3  40.    Having found that Plaintiffs have failed to demonstrate irreparable harm, the court

4    briefly considers the balance of hardships and finds that it tips in Defendants'

5    favor.  In considering the harm that a preliminary injunction might cause in

6    relation to a plaintiff's threatened injury, the court considers the relative size and

7    strength of each party.  Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 725 (9th

8    Cir. 1985) (established restaurant less likely to be adversely impacted by identity

9    problem than new restaurant).  Bellacure is a start-up company with a minuscule

10   share of the market, while Össur Gen II is a market leader earning $31 million a

11   year on just four of its products.  The court is persuaded that an injunction

12   prohibiting Bellacure from selling and advertising its only product would be

13   devastating to the company.

14

15                          **III.  CONCLUSION**

16     For the reasons stated above, the court DENIES Plaintiffs' motion for a

17   preliminary injunction (Dkt. # 38).

18     Dated this 14th day of December, 2005.

19

20

21   _____

22   JAMES L. ROBART
     United States District Judge

23

24

25

26

27

28

ORDER – 16