UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ÖSSUR HOLDINGS, INC., et al.,

    Plaintiffs,

v.

BELLACURE, INC., et al.,

    Defendants.

CASE NO. C05-1552JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on three separate motions for summary judgment (Dkt. ## 125, 132, and 135). The court has reviewed the papers filed in connection with these motions and has heard from counsel at oral argument. For the following reasons, the court DENIES the first motion from Defendants Bellacure, Inc. ("Bellacure") and Shane Sterling (Dkt. # 125), GRANTS in part and DENIES in part the second motion from Bellacure and Sterling (Dkt. # 132) and DENIES the third motion from Defendant Maurice Cannon (Dkt. # 135).

## II. BACKGROUND

Plaintiff Össur[1] designs and manufactures prosthetic and orthotic devices, including knee braces designed to treat osteoarthris ("OA"). Sterling worked for Össur

---

[1] Plaintiff Össur Holdings, Inc. is a Delaware corporation owned by Össur hf, an Icelandic company. Plaintiff Generation II, USA, Inc. is a Washington corporation, which in 2003 became a wholly owned subsidiary of Össur Holdings, Inc.. Össur Holdings, Inc. and Generation II, USA, Inc. do business in the United States under the name of Össur Gen II. The court refers to Plaintiffs collectively throughout this order as "Össur."

ORDER – 1

for four years as a product development engineer, managing engineer, and ultimately, as director of research and development. As a condition of his employment, Sterling signed a Business Protection Agreement ("BPA") that Össur drafted. His BPA contained a one-year non-solicitation provision, a one-year non-competition provision, and a non-disclosure provision targeted at protecting Össur's confidential information.

During the latter half of his time at Össur, Sterling supervised an effort to design an updated knee brace, referred to as the "Aponos Project." As part of the Aponos Project, Sterling and his team worked with ONE & Co., an industrial design firm. While ONE & Co. worked on design concepts for the exterior brace features, Sterling and his team developed concepts for the mechanics of the device. Össur eventually decided to shelve the project, although the parties dispute when and at what development stage this occurred.

Sterling left Össur voluntarily in April 2004. Roughly one month later, Sterling purchased software, tools, and equipment to begin work on his own knee brace design. During this time, Sterling met with a business and finance consultant. He also consulted an attorney. Five months later, Sterling contacted ONE & Co. – the same design firm that Össur hired for the Aponos Project – to discuss development of a tangible prototype.

In January 2005, Sterling incorporated Bellacure with the aim of competing in the knee brace industry. At that time, Sterling hired Cannon to serve as vice president of sales and marketing. Like Sterling, Cannon was an ex-Össur employee with a BPA that contained non-solicitation and non-disclosure provisions. At Össur, Cannon served as a sales associate beginning in November 1999 and ultimately, worked as a director of national sales. He left Össur on October 1, 2004 after the company demoted him to the position of area manager.

In August 2005, Bellacure launched its website, complete with a description of its new OA knee brace. Believing that Defendants had pilfered its Aponos Project ideas, Össur filed suit one month later against Bellacure, Sterling, Cannon and their respective

ORDER – 2

marital communities.  Össur alleged misappropriation of trade secrets, Lanham Act violations, breach of contract, breach of fiduciary duty, and unfair competition. Immediately after filing suit, Össur moved for a temporary restraining order, which this court converted to a motion for a preliminary injunction and thereafter, denied (Dkt. # 83).  Defendants now move for summary judgment on Össur's trade secrets, breach of contract, and Lanham Act claims.

### III.  ANALYSIS

In examining a summary judgment motion, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint.  See UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1995).

**A.    Misappropriation of Trade Secrets**

Washington's version of the Uniform Trade Secrets Act ("the statute") defines a trade secret as:

ORDER – 3

> Information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> > (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> > (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW § 19.108.010(4). A new combination of features, even if it includes elements already generally known, may constitute a protectable trade secret. Boeing Co. v. Sierracin Corp., 738 P.2d 665, 675 (Wash. 1987) (noting that "trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets."). Although the statute does not expressly say so, Washington courts also require novelty in order for particular information to qualify for trade secret protection. Boeing, 738 P.2d at 674; Buffets, Inc. v. Klinke, 73 F.3d 965, 967-68 (9th Cir. 1996). Importantly, "[w]hile the definition of a trade secret is a matter of law . . . the determination in a given case whether specific information is a trade secret is a *factual question*." Ed Nowogroski Ins., Inc. v. Rucker, 971 P.2d 936, 941 (Wash. 1999) (emphasis added).

At the threshold, Defendants[2] contend that Össur's claim fails as a matter of law because Össur did not transform its Aponos Project from the "drawing board" into a "workable product." Defs. Mot. I at 22. The court disagrees with Defendants' characterization of what the law requires. Contrary to the notion that a claimant must somehow implement his or her idea to obtain trade secret status, Washington courts recognize a diversity of "information" that falls within the statutory definition. E.g. Boeing, 738 P.2d at 675 (reasoning that engineering drawings fall under the trade secret

---

[2]The court refers to "Defendants" in the collective as to both the trade secrets and Lanham Act claims. Although only Sterling and Bellacure move for summary judgment on these claims, Cannon incorporates their arguments in his separate motion for summary judgment. Cannon Mot. at 12.

ORDER – 4

definition); Nowogroski, 971 P.2d at 941 (same as to customer lists). Here, it is undisputed that Össur generated CAD drawings, sketches, 3-D models, crude prototypes, reports, and the like. Setting aside whether the particular content embodies a protectable trade secret, Össur's deliverables are easily the type of "information" that falls within the statutory definition of a trade secret.

The remaining, more difficult questions of (1) whether the information is novel, and (2) whether it is valuable as generally unknown to others, involve genuine issues of fact for the jury.[3] As to the first question, although Össur appears to concede that individual elements of its Aponos Project concepts were already part of the public domain, it provides sufficient evidence from which a reasonable jury could conclude that the combination of such features was unique and new to the industry. E.g., Pollo Decl. ¶ 6, 9, Ex. 1 (Pollo Report), Young Dep. at 56 (describing Aponos Project as an attempt to create an "entirely different look" that would result in a patentable device). Likewise, Össur raises a genuine issue of fact as to the second question, citing its own time and expenditures on the Aponos Project, e.g., Daw Dep. at 30-31, the growth potential of the OA knee brace market generally, e.g., Fourth Magnusdottir Decl., Ex. 5, as well as the undisputed problems with the knee braces on the market. From this evidence, a reasonable jury could infer that Össur valued its significant research and development as unknown to its competitors. Accordingly, the court denies Defendants' motion for summary judgment on Össur's trade secrets claim.

---

[3]Defendants do not directly dispute the remaining elements of a trade secrets claim; namely, whether Össur made reasonable attempts to keep the information secret, and whether Defendants misappropriated such information. Defendants merely make one fleeting reference to the undisputed fact that Sterling did not physically take anything from Össur without its express permission. Defs.' Mot I at 4.

ORDER – 5

**B.      Breach of Contract Claim Against Sterling**

Össur alleges that Sterling breached the non-competition, non-disclosure, and non-solicitation provisions of his BPA by using Össur's confidential information to develop a rival product with Cannon's help.  Compl. ¶¶ 76-85.  It is undisputed that Sterling's non-competition and non-solicitation periods expired no later than April 16, 2005.  The non-disclosure clause contains no limitation as to duration.

Before the court addresses the particular BPA provisions at issue, the court disposes of Sterling's overarching contention that Össur cannot prevail on any of its breach of contract claims because it failed to mitigate damages when it delayed launching its own knee brace.  Whether an injured party has used reasonable means under the circumstances to mitigate its damages is a question of fact for the jury, Flint v. Hart, 917 P.2d 590, 596 (Wash. Ct. App. 1996).  As such, the court rejects this argument as a basis for summary judgment.

      **1.      The Non-Competition Provision**

The construction and legal effect of a covenant not to compete, including its "reasonableness," is a question of law.  Perry v. Moran, 748 P.2d 224, 228 (Wash. 1987).  The court's aim in construing contract terms is to give effect to the intentions of the parties with practical and reasonable results.  Eurick v. Pemco Ins. Co., 738 P.2d 251, 252 (Wash. 1987).  On a breach of contract claim, summary judgment is appropriate where, as here, the facts surrounding formation and breach are not in dispute.  Perry, 748 P.2d at 228.

Here, it is undisputed that Sterling hired a design company, applied for a patent, procured supplies, filed Bellacure's articles of incorporation, hired a vice president of sales (Cannon), and completed a majority of product development for his new brace – all before the non-competition agreement expired.  It is also undisputed that he launched his completed product and website three months after the expiration date.

ORDER – 6

Although the parties agree on the material facts, they strongly disagree on the meaning of particular terms in Sterling's non-competition provision, which provides:

> For 12 months after termination of employment [e]mployee shall not directly or indirectly, own, operate, provide financial, technical, or other assistance or services to, accept any involvement with, or be connected with as an officer, partner, proprietor, consultant, representative, agent or stckholder . . . any organization which engages in business that is in direct competition with [Össur].

Sterling BPA ¶ 9. Sterling urges the court to strictly construe the contract term "organization" to mean "established commercial operation," and the phrase "engages in business . . . in direct competition" to mean marketing and selling a rival product. Össur argues that the phrase "engages in business" encompasses *preparations* to compete (e.g., design and engineering) – regardless of the competing organization's status.

Based on the court's construction of the terms in dispute, the court concludes that Sterling did not violate his BPA's non-competition provision within the limitations period. First, the court accepts Sterling's construction of the term "engages in business . . . in direct competition" as limited to marketing and selling a rival product. This construction follows from Össur's selection of the present tense form of the verb "engage," as well as the limitation imposed by the word "direct" to modify the term "competition." The court notes that, as the drafting party, Össur could have written its non-competition provision to prevent Sterling from engaging in pre-market preparation. It did not, and the court declines to construe any alleged ambiguity in Össur's favor. See Huber v. Coast Inv. Co., Inc., 638 P.2d 609, 612 (Wash. 1981) (citing cannon of construction that courts construe contract language against the drafter). The court's construction also squares with the ordinary sense of what it means to engage in direct competition. As confirmed at oral argument, there is no evidence on the record that any consumer – let alone Össur – even knew that Bellacure's knee brace existed until after Sterling launched the website and posted the product for sale. An average person would read the contract to mean that, in order to violate its terms, Sterling would have had to

ORDER – 7

entice Össur's customers (or potential customers) to buy his knee brace. See Eurick v. Pemco Ins. Co., 738 P.2d 251, 252 (Wash. 1987) (noting that contract is read as an average person would understand it). As noted, Sterling did not market his device until after his non-competition provision expired.

As a final note, the court adopts its construction mindful of public policy concerns regarding an employee's mobility within his or her field and the interests in the public's access to that employee's skills. Knight, Vale & Gregory v. McDaniel, 680 P.2d 448, 452 (Wash. Ct. App. 1984) (stating that public policy requires courts to "carefully examine" covenants not to compete notwithstanding an employer's legitimate business interest). For these reasons, the court concludes that Sterling is not in breach; and therefore, the court grants Sterling's summary judgment motion as to the breach of contract claim based on the BPA's non-competition provision.

### 2. The Non-Disclosure Provision

Sterling's non-disclosure provision prohibits disclosure or use of any "Confidential Information" for the "gain, advantage, or profit of anyone other than [Össur] . . . ." Sterling BPA ¶ 8. The definition of "Confidential Information," in turn, includes trade secrets. Id. ¶ 5. Because the court has already concluded that it must deny summary judgment as to the trade secrets claim, it must deny Sterling's motion as to his alleged breach of the BPA's non-disclosure provision.

### 3. The Non-Solicitation Provision

Sterling's non-solicitation provision provides:

> Employee shall not during the term of Employee's employment and for one year after termination . . . induce or attempt to induce, directly or by assisting others, any person who is in the employment of, or is providing services to, the Employer to leave such employment or business relationship.

Sterling BPA ¶ 10. It is undisputed that Sterling hired Cannon in January 2005, approximately three months after Cannon left Össur. Based on this fact, Sterling contends that he could not have violated BPA's non-solicitation provision because he did

ORDER – 8

not solicit a *current* Össur employee. The court rejects Sterling's logic. It is immaterial that he hired Cannon during Cannon's period of unemployment because Össur presents evidence from which a jury could reasonably conclude that Sterling attempted to induce Cannon to depart Össur while Cannon was still in the company's employ. E.g., Andrus Decl., Ex. 44 (email from Sterling citing a "verbal commitment" from Cannon in January 2004 to join Bellacure). As such, the court denies Sterling's summary judgment motion on his alleged breach of the non-solicitation provision.

**C.    Lanham Act Claim**

Össur claims that Defendants have violated (and continue to violate) section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)[4], by falsely advertising various features of their product on the Bellacure website and in press releases. To prevail on its claim, Össur must show that:

(1) Defendants made a false statement about their knee brace in a commercial advertisement or promotion;
(2) the statement actually deceived or has the tendency to deceive consumers;
(3) the deception is material;
(4) Defendants caused the false statement to enter interstate commerce; and
(5) Össur has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from Össur to Bellacure, or by a lessening of goodwill associated with the its product.

See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). Defendants do not defend the veracity of any of their allegedly deceptive statements. Instead, Defendants argue that summary judgment is appropriate because Össur fails to

---

[4]The relevant portion of 15 U.S.C. § 1125(a) provides:
(1) Any person who, on or in connection with any goods or services . . . uses in commerce any word . . . or any false or misleading description of fact, or false or misleading representation of fact, which- (A) . . . or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

ORDER – 9

provide any evidence in support of the following supposed claim elements: (1) that the statements are likely to confuse customers about the origin of the product, and (2) that Össur has suffered an injury.

As to the first element, Defendants miss the mark by citing the wrong standard, which is perhaps not surprising given that Defendants cite out-of-circuit precedent concerning entirely different Lanham Act causes of action. The court assumes that Defendants meant to cite the requirement that Össur show that the statements deceived consumers or had the tendency to do so. Defendants cite no authority to suggest that such an inquiry is dependent on whether Össur can also demonstrate confusion as to the origin of the product. Regardless, if Össur can show that the statements are literally false (an argument Defendants do not raise in their motion), the court is permitted to allow the jury to presume that Össur has met its burden on whether the statements cause consumer deception. See William H. Morris Co. v. Group W, Inc., 66 F.3d 255, 259 (9th Cir. 1995) (citing Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129-30 (3d Cir. 1994) ("If a plaintiff proves a challenged claim is literally false, a court may grant relief without considering whether the buying public was misled.")).

As to the second Lanham Act element that Defendants challenge (Össur's alleged injury) the court notes that Össur need not produce evidence of injury to prevail on a claim for permanent injunctive relief to prevent Defendants from making the allegedly false statements. Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1989). Defendants argue, however, that Össur's claim for *damages* fails because, according to Defendants, Össur has fabricated a material issue of fact, which the court must disregard. Defendants contend that Össur's President, Huld Magnusdottir, has contradicted her prior deposition testimony in her declaration in support of the instant motion in which she states that Össur suffered a decrease in sales coincident with Bellacure's introduction of its OA brace. Compare, 4th Magnusdottir Decl. ¶ 8 (citing

ORDER – 10

data that reflects a drop in Össur's sales during the latter months of 2005 and early 2006), and Magnusdottir Dep. at 122 (denying that its drop in sales had any relation to Bellacure's launch). The court is not persuaded that it must disregard Magnusdottir's declaration. While it is true that a party cannot manufacture an issue of fact that flatly contradicts prior testimony, Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991), the court does not necessarily strike such evidence unless it finds that the party's submission is a "sham" declaration. Id. at 266-67. The court considers the change in testimony here the plausible result of newly discovered evidence. Indeed, Magnusdottir's declaration on this subject begins: "Össur now has data showing . . . ." 4th Magnusdottir's Decl. ¶ 8. The court concludes that the jury is entitled to weigh this evidence at trial. As such, the court denies Defendants' motion for summary judgment on the Lanham Act claim.

**D.     Breach of Contract Claims Against Cannon**

Össur alleges that Cannon breached the non-disclosure and non-solicitation provisions of his BPA when he used confidential information during and after his departure from Össur to solicit the company's distributors to sign with Bellacure.

Cannon contends that two threshold issues preclude enforcement of all or part of his contract. First, he argues that his BPA lacks consideration. The court disagrees. Össur provides evidence that, in its hire letter, it offered Cannon a promotion to the director of sales position with a concomitant salary increase on the condition that he would sign the BPA, which Össur attached to his letter. Mathiowetz Decl., Ex. 3 (hire letter stating: "This offer is also contingent on you signing a Business Protection Agreement (draft attached). . . "). There is no dispute that Cannon signed the agreement – albeit at his own leisure, two months later. The court denies summary judgment on this basis.

In the alternative, Cannon argues that his BPA's non-solicitation clause is unenforceable because it is indefinite as to its duration. As noted previously, whether a covenant not to compete (or, as here, a non-solicitation agreement) is reasonable is a

ORDER – 11

question of law.  Perry, 748 P.2d at 228.  Washington courts measure reasonableness according to three factors: (1) whether the restraint is necessary for the protection of the employer's business; (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill; and (3) whether the degree of injury to the public is such that the loss of the service and skill of the employee warrants non-enforcement of the covenant.  Id. (citations omitted).  To the extent that the scope of a particular provision is broader than necessary, the court has discretion to re-write the contract to make it reasonable.  Sheppard v. Blackstock Lumber Co., Inc., 540 P.2d 1373, 1377 (Wash. 1975) (reversing and remanding trial court's grant of summary judgment for employer to determine whether a modification could render the contract enforceable).

The court concludes that a one-year duration for the non-solicitation provision renders the contract reasonable, and therefore enforceable.  Össur concedes that a one-year limitations period as to the non-solicitation clause would be appropriate to protect its interests.  Össur Opp'n at 22.  At the same time, a one-year restraint adequately protects both the public's interest and Cannon's desire of remaining mobile in his chosen profession.

### 1. The Non-Disclosure Provision

Cannon's non-disclosure provision prohibits disclosure of any "Confidential Information."  Cannon BPA ¶ 2.3(a).  The sweeping definition of Confidential Information, in turn, includes any information concerning customers, employees, and vendors; information concerning Össur's own financial affairs and marketing plans; information regarding relationships with third party companies and business partners; and much more.  Id. ¶ 2.1.  Such information derives its confidential nature if, for example, it is "treated by [Össur] as confidential" or "would reasonably be viewed as having value to a competitor."  Id.  "'Confidential Information' does not include information that is

ORDER – 12

generally known to the public or is disclosed to Employee by [Össur] without restriction." Id.

In his deposition, Cannon concedes that he disclosed names and emails of Össur contacts (including some distributors) to an independent marketing firm in February 2005 for the purposes of conducting an anonymous market survey. Cannon Dep at 143-47; Mathiowetz Decl., Ex. 13, 14, 20. Cannon contends that the information he possessed regarding Össur's distributors was publicly available or generally known in the industry, and thus he was not in breach of his BPA.

Because the court is constrained to draw all reasonable inferences from the evidence in favor of Össur, the court concludes that summary judgment is inappropriate. Össur appears to concede that the distributor list itself was publically available, Young Dep. at 47, 49 (indicating that, with diligence, any member of the public could make some 52 phone calls to track down the contact information of Össur's distributors). Össur maintains, however, that Cannon left Össur with something more; that is to say, "all of the other information [such as], who the key contacts are, . . . who performs and who does not, who is successful in attracting business from potential buyers, who needs training . . . ." Össur Opp'n at 7-8. In support of this notion, Össur cites Magnusdottir's testimony in which she states that the distribution list is valuable because of the work that goes into "[e]mploying the [distributors], finding them, training them, and preparing them to sell our products." Manusdottir Dep. at 72. Össur also cites the testimony of its former President, Alan Young, who explained that, over time, Össur began to value the advantage in keeping the information from its competitors because it contained "the rankings of the distributors and how well they were doing." Young Dep. at 48.

Further, Össur provides evidence that when Cannon communicated with Össur's distributor Pro Motion, Mathiowetz Decl., Ex. 25, he knew he was competing for one of Össur's most important business partners, id., Ex. 17 (January 2004 email to Össur's sales managers ranking top ten distributors). Thus, regardless of the admittedly public nature of

ORDER – 13

the distributor list itself, a jury could reasonably infer that when Cannon allegedly solicited the business of Össur distributors, he used confidential information that enabled him to pick and choose the best candidates. Accordingly, the court denies Cannon's summary judgment motion on his alleged breach of the BPA's non-disclosure provision.

### 2. The Non-Solicitation Provision

Cannon's non-solicitation clause prevents him from soliciting Össur's distributors to work with Bellacure. Cannon BPA ¶2.3(b). The court-imposed one-year limitations period sets the expiration date of this provision no later than October 1, 2005. Mathiowetz Decl., Ex. 38 (letter setting October 1, 2004 as Cannon's termination date). As early as June 2005, Össur provides evidence that Cannon was engaged in email communication with at least one of Össur's current distributors, Pro Motion, to sell Bellacure products. Mathiowetz Decl., Ex. 25. Sometime thereafter, Cannon records securing a "verbal commitment" from Pro Motion. Id., Ex. 21. Despite the unclear timing of various events, a reasonable jury could conclude that during the one-year limitations period Cannon engaged in solicitation of Össur's distributors to sell Bellacure's device. Indeed, Össur points to an email from Sterling to his business consultant stating that Cannon was "doing a lot of recon" for him several months before Cannon left Össur. Id., Ex. 10. As such, the court denies Cannon's summary judgment motion on his alleged breach of the BPA's non-solicitation provision.

### IV. CONCLUSION

For the reasons stated above, the court DENIES Defendants' first motion (Dkt. # 125), GRANTS in part and DENIES in part Defendants' second motion (Dkt. # 132), and DENIES Cannon's third motion (Dkt. # 135).

Dated this 18th day of August, 2006.

JAMES L. ROBART
United States District Judge